UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____

| | | |
|---|---|---|
| Dwayne Kula, Individually; Dwayne Kula, | : | |
| as Sole Shareholder of Everlite 99 and of DRK | : | |
| Enterprises, LLC; Everlite 99; DRK | : | |
| Enterprises, LLC; and Everlite 99, | : | |
| Derivatively as Shareholder of Every | : | |
| Watt Matters International LLC | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| | : | Civil Action No. |
| v. | : | |
| | : | |
| Every Watt Matters, LLC; | : | **DEMAND FOR JURY TRIAL** |
| EWM-LED, LLC | : | |
| George Blackstone, ASB Holding Group, LLC | : | |
| Stanley Brettschneider, Andrew | : | |
| Brettschneider, and Neal Forsthoeffel, | : | |
| | : | |
| Defendants, | : | |

## PARTIES

1. Every Watt Matter International, LLC ("International") is a Washington State Limited Liability Company involved in the LED lighting business and with a principal place of business at 2501 SE Columbia Way Ste 220 Vancouver, WA 98661, Washington

2. Defendant EWM, LLC, ("EWM") is a Washington Corporation based out of 2501 SE Columbia Way Ste 220 Vancouver, WA 98661 and was involved in selling home energy efficiency products in the state of California and later converted to selling LED products after the California business venture failed.

3. EWM-LED, LLC, ("EWM-LED") is a new Washington based corporation at 2501 SE Columbia Way Ste 220 Vancouver, WA 98661, Washington in the business of selling LED products under the website www.everywattmatters.com.

1

4. Plaintiff Dwayne Kula ("Kula") is an individual residing in the State of Rhode Island and is the sole shareholder of DRK Enterprises, LLC.  Kula is also the sole shareholder of Everlite 99, LLC, which is a member of International.

5. Plaintiff Everlite 99, LLC ("Everlite") is a New Hampshire LLC at 1 Chestnut Street, 4M, Nashua, NH and is a member of International.

6. Plaintiff DRK Enterprises, LLC ("DRK") is a New Hampshire Corporation at 1 Chestnut Street, 4M, Nashua, NH and is an internet-based business selling LED products, with a dba of MyLEDLightingGuide.com.

7. Dwayne Kula, Everlite 99, LLC, DRK Enterprises, LLC all individually and derivatively are referred to collectively hereafter as "Plaintiff."

8. Defendant George H. Blackstone ("Blackstone") is a resident of Clark County, Washington State.

9. Defendant ASB HOLDING GROUP LLC ("ASB") is a limited liability entity located in Westchester County, New York.

10. Defendant Stanley Brettschneider Stanley is a member of ASB.

11. Defendant Andrew Brettschneider is a member of ASB.

12. Upon information and belief, Stanley Brettschneider and Andrew Brettschneider are the sole members of ASB (referred to collectively as the "Brettschneiders.")

13. Defendant Neal Forsthoeffel, ("Forsthoeffel") Chief Operations Officer, International and LED, is a resident of the State of Oregon.

14. Kula (via Everlite), Blackstone (via EWM, LLC) and the Brettschneiders (via ASB Holdings) make up the membership of International with interests of 40%, 50% and 10%, respectively.

15. Upon information and belief, Blackstone and the Brettschneiders are the sole members of EWM-LED.

## VENUE

16. Jurisdiction is proper under 28 U.S.C. §§ 1331, 1332, 1367 as the action herein contains claims under Federal Law, additionally, for the claims that are state claims diversity is proper as the amount in controversy exceeds $75,000.00 and the parties are completely diverse.

17. Rhode Island is a proper venue as it is where tortious injury occurred and other actions took place and where Kula operated his business and performed work for the Defendants and this action contains derivate claims under 28 U.S. Code § 1401 Jurisdiction the basis for it that basically course of dealing and contracts, Conspiracy and tortious conduct of defendants.

## FACTUAL ALLEGATIONS

18. In or about March, 2013, Blackstone contacted Kula, represented himself as a successful businessman with a track record of starting, building and selling businesses, and proposed that he and Kula form a joint venture by which the two would sell LED products via an outside sales structure. Kula already had an established internet based LED company, DRK Enterprises, LLC, dba Myledlightingguide.com.

19. Kula and Blackstone proceeded to negotiate a Joint Venture Agreement ("JV Agreement") whereby Kula would provide the necessary industry expertise, ground breaking proprietary software, supply vendor connections, and assist with closing business for the joint venture; and Blackstone would run the day to operations, hire employees, handle finances, and otherwise manage the venture.

20. During the joint venture negotiations, Blackstone misrepresented his business success and financial position to Kula, including but not limited to declaring he had patented the propane

grill, professing to have been a "tier one" distributor for General Motors, running a

successful software development company, failing to disclose a failed real estate venture in

Mexico and a failed energy management company, EWM, LLC, for which he was indebted

over a Million Dollars ($1,000,000). Based in large part on these misrepresentations, Kula

entered into a JV Agreement with Blackstone whereby they would share equally in profits

and pay their own business expenses until the company was able to reimburse them when

agreed by both parties.

21. During the joint venture negotiations, Blackstone attempted to get Kula to merge his internet

business, DRK Enterprises, LLC, with the new joint venture. Kula made it explicitly clear

that no such merger would occur and that he would continue ownership and operation of this

successful internet based company independently from the joint venture.

22. Blackstone ran the joint venture out of an office in Washington State, near his residence and

used his previously existing EWM, LLC bank account and supplies. Kula traveled around the

country assisting the sales force and providing expertise from his Rhode Island home.

23. During 2013 and 2014, under a "Director Income Sharing Agreement" several individuals

and business entities were signed on as "Directors" to produce sales of LED products for the

joint venture for which they would be compensated from profits.

24. ASB Holdings, wholly owned by Stanley and Andrew Brettschneider, joined the joint

venture as a "Director."

25. In October Kula was concerned that the company was not making a profit. Blackstone

convinced Kula that the venture needed an influx of capital to become viable.

26. Upon information and belief, Blackstone had been negotiating a buy in of the business by

ASB prior to discussing the need for capital with Kula. Kula was not part of this negotiation.

27. In or about November 2014, Blackstone presented to Kula an agreement he had negotiated with ASB whereby ASB would pay 2.5 million dollars to become an equal member of the joint venture. However, the agreement included a provision that Kula's internet company would become part of the joint venture.

28. Kula once again refused to merge his internet company into the joint venture.

29. In or about December 2014, Blackstone presented a modified agreement whereby ASB would contribute up to $750,000 for up to a 10% interest in the venture.   Kula agreed to the terms and to contribute the 10% ownership interest from his interest in exchange for Blackstone's agreement to cease his attempts to merge DRK Enterprises with the joint venture.

30. On or about January 1, 2015, converted their joint venture into a Washington State Limited Liability Company, EWM, LLC.

31. At no time was it ever agreed or required that Kula would merge his separate, internet-based, LED company, DRK, with International or with any other entity.

32. At no time was it ever agreed or required that Kula would cease to operate his separate, internet-based, LED company, DRK. In fact, the International web site and advertising stated that Kula owned and operated the successful LED website, MyLEDLightingGuide.com.

33. On or about January 5, 2015, Kula and Blackstone amended the January 1, 2015 Operating Agreement to include provisions for ASB's buy in to the company and included ASB as a Class A member with a .45% membership interest having already made a capital contribution of $40,000., attached hereto as Exhibit "A."

34. The January 5, 2015 Amended Operating Agreement was executed by Kula, Blackstone, and Stanley and Andrew Brettschneider on behalf of ASB and is attached hereto.

35. ASB's contribution of $40,000 to the company prior to the formation of the LLC, evidences that dealings between ASB and Blackstone had been previously ongoing without Kula's knowledge.

36. Relevant provisions of the Amended Operating Agreement include the following in Sections 7 and 9:

> International finances were to be run out of its own bank account and no co-mingling of funds was allowed;
>
> no member was to receive compensation, interest on loans, reimbursement of expenses unless and until agreed to by all members;
>
> members were to receive disbursements of profits when it became possible to do so and not before;
>
> no member was to receive any return of contribution.

37. Unbeknownst to Kula, virtually all funds that were taken in by International were diverted by Blackstone to the EWM-LED bank account, still under Blackstone's sole control or into one of two other bank accounts under Blackstone's sole control.

38. Upon information and belief, Blackstone had International funds deposited directly by wire transfer, electronic banking, and/or check.

39. Blackstone, through his COO, Neal Forsthoeffel, on at least one occasion, provided Kula with EWM, LLC's wiring instructions under the pretext that the instructions were for International and accepted funds from Kula without disclosing the actual destination.

40. Blackstone accepted funds from ASB as part of the buy-in pursuant to the Amended Operating Agreement. Between June 12, 2014 and June 9, 2016, ASB deposited approximately $710,000 into International's bank account only to have said funds be

immediately transferred by Blackstone to his own EWM, LLC account and on to his other personal accounts.

41. Unbeknownst to Kula, both Blackstone and ASB had been violating the Amended Operating Agreement, Section 7 by Blackstone signing and ASB accepting promissory notes from International for the above referenced $710,000.

42. Upon information and belief, the above referenced promissory notes were contemplated and executed by Blackstone and ASB in order to set up a takeover of the company and oust Kula as, later, ASB attempted to collect on those promissory notes and allegedly took control of International for defaulting on the fraudulent notes.

43. Blackstone further breached his fiduciary duties of loyalty, and care by recklessly spending the funds ASB infused into the company. For example, Blackstone without Kula's knowledge invested approximately $100,000 in a failed grow light development project and then continued the project after being confronted by Kula on the unauthorized spending, without Kula's knowledge spent company funds on unnecessary purchases,   hired employees for his promised rush of business  expected from the infusion of capital, fired the same employees shortly after,, recklessly purchased $70,000 worth of fraudulent LED tubes from an unproven vendor without Kula's knowledge which were confiscated by U.S. Customs Department and destroyed;

44. On October 30, 2015, Blackstone sent an impassioned plea for funds via email. He resent the email on November 4, 2015. In the email, Blackstone said that if the shareholders do not provide a cash injection, the doors would close. Blackstone attached fraudulent financial records to the above referenced e-mail communication which, upon information and belief, were knowingly fraudulently produced by International's COO, Forsthoeffel. Blackstone

further claimed he had put in Fifty Thousand 00/100 Dollars ($50,000.00), and wanted Kula

to contribute Forty Thousand 00/100 Dollars ($40,000.00) and Brettschneider  to contribute

Ten Thousand 00/100 Dollars ($10,000.00). Blackstone further stated that he had made

capital contributions of $313,872.71.  These statements were false and along with the

fraudulent documents were intentionally used to induce Kula and did induce Kula to part

with further cash.

45. Blackstone through his COO, Forsthoeffel, fraudulently provided Kula with Blackstone's

EWM, LLC wiring instructions for the $40,000 instead of those for International's account.

Blackstone later admitted by e-mail on November 22,2016 that he had not used the money

for payroll; he also admitted in the November 22, 2016 communication that he had repaid

himself sums of money from International in violation of the Operating Agreement.

46. Kula later discovered that in the four months prior to Blackstone's plea for cash from Kula,

Blackstone had transferred $210,000 from International to EWM, LLC by electronic

transfers and further transferred $85,000 of those funds to two other accounts believed to be

Blackstone's personal accounts.

47. In late 2015, Kula became concerned that he had received no distributions of profits that

time, Kula had already spent over $300,000 in conducting business on behalf of both the JV

and International at his own expense, including but not limited to such activities as: sales

support, product design, travel to support sales, travel overseas, travel to Washington

headquarters, providing product to fulfill International sales without reimbursement, and cash

injections.

48. In late 2015, Kula also became concerned about complaints from employees and from

customers regarding the pricing and quality of the products as well as Blackstone's failure to

take corrective actions where products and service were concerned. Kula discovered that Blackstone had been increasing the margins of profit on most of his proposals to the point that International was pricing itself out of the market. When Kula confronted Blackstone on this, Blackstone refused to adjust the margins.

49. In late 2015, Kula also became aware that Blackstone was surreptitiously using company funds to pay for his own expenses in violation of the Operating Agreement.

50. Sometime in 2014, Stanley Brettschneider was informed by an International employee, Kendra Paschall, that customers he and she had brought to the table were being sent false and fraudulent balance sheets and financial statements created and provided by Blackstone and Forsthoeffel. Brettschneider, informed Paschall that he had no issue with the fraudulent data as long as he was not required to sign it as director.

51. Kula was informed by Paschall in late 2015 about the falsified financial documents and was able to obtain some of said documents. Kula confronted Blackstone about said documents but Blackstone denied ever sending a falsified balance sheet or financial information to anyone.

52. Upon information and belief, Blackstone and Forsthoeffel, regularly colluded to make and made revisions and amendments to the financial records to serve their purposes, whether to lure a new customer or vendor or to hide the financial raid of the company.

53. In or about December, 2015, while working on software that allowed the International portal software Kula developed to interface with QuickBooks, Kula discovered significant issues and discrepancies with the information in QuickBooks. Forensic accounting showed that money was comingled between International and EWM, LLC, that only one set of books was used for both companies, that money was regularly transferred out of International's account and into EWM, LLC.

54. Over Kula's objection, Blackstone put International in legal jeopardy by misrepresenting in its advertising that the company manufactured its products in its own facilities overseas, that only this International manufactured product was being sold by the company, that all the product was DLC d under its own name, and that International was capitalized in excess of $50 million dollars.

55. In light of the emerging issues concerning Blackstone's truthfulness in business, on or about February 15th of 2016, Kula resigned as president of International. Later that month, Kula demanded to review the company records and was provided with yet another set of un-matching financial records.

56. Blackstone attempted to deprive Kula of his interest in International.  On or about July 2016, Blackstone provided an unsigned schedule to the Amended Operating Agreement that purported to make him a majority shareholder with 55% interest, in a letter to Kula and ASB and called a special shareholder meeting to divest Kula of his interest in International. Kula retained legal counsel and the matter was dropped. Two months later, by letter dated, September 6, 2016, ASB, Stan Brettschneider and Andy Brettschneider, alleging they were creditors and ignoring their shareholder status, demanded repayment of the $750,000 they had paid to International for their 10% interest. They relied on the promissory notes Blackstone had surreptitiously provided them.

57. In or about September 22, 2016, International corporate attorney, Stephen Bennet, sent a letter by United States mail service to Kula claiming that International "is facing a serious creditor action from ASB."  Bennet reiterated the fantasy that ASB was a creditor rather than are shareholder and had a right to take action against International.

58. ASB, through their attorneys, sent Kula and Blackstone documentation to sign their shares in and all the assets of International over to ASB to avoid a creditor action AT the same time, in the same letter, ASB threatened to pursue unfounded criminal charges against Kula unless he signed over the shares.

59. On or about December 21, 2016, Blackstone signed the documents supplied by ASB and encouraged Kula to do the same.

60. Kula refused to sign his shares over to ASB. In retaliation and to inflict duress, on January 1, 2017 ASB filed a lawsuit, as creditors, against Kula, DRK Enterprises and Everlite99 alleging that Kula had verbally promised to merge his successful internet based business with International thus inducing ASB to provide the capital funding.

61. Kula was informed that ASB would settle the case if he signed over his company to ASB. Blackstone sent emails at the end of December 2016 that the company was shutting down and employees were being laid off in accordance to the ASB Creditor action. However, the company was not shut down, and no employee were laid off. Upon information and belief, new employees were still being hired in February of 2017 and the company was still operating.

62. Blackstone sent an email on or about March 20th of 2017 stating that the company assets were to be sold on March 30th, 2017 in accordance with the creditor demand.

63. On March 27, 2017 Blackstone registered with the Washington State Secretary of State a new company, EWM-LED located in the same Washington offices of International.

64. In April of 2017, Kula sent Blackstone an email asking for a list of all employees laid off and a list of all assets that were sold, to whom, and the company who was contracted to do the sale. No response was given.

65. Upon information and belief, there is no complaint filed by ASB against Blackstone, although it was with him that ASB negotiated the buy in to International and the alleged inclusion of Kula'' internet based company.

66. Upon information and belief, Blackstone and ASB are together operating EWM-LED, using the contacts, software, knowledge that Kula brought to International; they are using the same employees, same phone number, same address, and same website as International had.

## COUNT I

### Shareholder Derivate Action Breach of Contract

67. Plaintiff reasserts Paragraphs 1 through 66 above and restates and incorporates them herein by reference.

68. Pursuant to the operating agreement and shareholder consents, Defendants agreed and Plaintiff, in good faith, agreed to engage in business with each other to accomplish their business goals in accordance with industry standards.

69. Defendants by their conduct as described herein breached the contract and breached an implied covenant of good faith and fair dealing.

70. At all times relevant hereto Plaintiff performed his obligations under the contract in good faith.

71. Defendants are liable for breach of contract and for breach of an implied covenant of good faith and fair dealing.

72. As a result of Defendants' breaches of contract, Plaintiff has suffered damages.

## COUNT II

### Tortious Interference with  Contractual Relations and Contracts

73.  Plaintiff reasserts Paragraphs 1 through 72 above and restates and incorporates them herein by reference.

74. The allegations above constitute a cause of action for tortious interference, moreover;

75. Defendants failing in their attempt to legitimately launch and run a successful company, engaged in sabotage by trying to interfere with Kula's successful DRK Enterprises, LLC, using Kula's good name and reputation to pass off DRK Enterprises, LLC as part of International to induce businesses to work with EWM, LLC.

76. When unsuccessful, Defendants engaged in actions to force Kula out as President of International, then engaged in behavior to hide funds and contracts from Kula, and tried to take ownership of DRK Enterprises, LLC.

## COUNT III

### Breaches of Implied Covenant of Good Faith and Fair Dealing

77. Plaintiff reasserts Paragraphs 1 through 76 above and restates and incorporates them herein by reference.

78. It is well established that every contract carries an implied covenant of good faith and fair dealing whereby the parties treat each other fairly and act in good faith and no party to the contract shall take any action to harm another party's right under the contract.

79. Defendants each breached said implied covenant of good faith and fair dealing causing damage to Plaintiff.

## COUNT IV

### Brach of Fiduciary Duty

80. Plaintiff reasserts Paragraphs 1 through 79 above and restates and incorporates them herein by reference.

81. Defendants, had a fiduciary relationship with Plaintiff.

82. It was therefore Defendants' duty to:

   a) Exercise utmost good faith in their dealings with Plaintiff with due regard for Plaintiff's interests;

   b) Make full and truthful disclosure of all material facts to Plaintiff and not to omit any material fact that would be necessary to make the facts disclosed not misleading;

   c) To refrain from abusing such confidence by obtaining any advantage for himself or any third party at the expense of Plaintiff;

   d) be loyal to Plaintiff.

83. Kula relied upon Defendants fulfilling their fiduciary duty when he sent $40,000 pursuant to Blackstone's wiring instructions, expended over $300,000 of his own money to close business on behalf of International, gave Defendants access to his private software and business contacts, and allowed Blackstone to financially manage the company's assets.

84. Defendants breached said fiduciary duty, causing damage to Plaintiff.

85. Defendants' actions that breached said fiduciary duty include but are not limited to:

   a) committing larceny as set forth, *infra;*

   b) committing embezzlement as set forth, *infra;*

   c) permitting and participating in a hostile and illegal takeover of International;

d) failing to ensure the quality of LED products distributed to customers, thus, creating potential liability for Plaintiff as part of International;

e) failing to properly report the financial status of International to Plaintiff, potential and current customers, and the taxing authorities, thereby exposing Plaintiff to potential liability as a shareholder of International.

## COUNT V

## Fraud

86. Plaintiff reasserts Paragraphs 1 through 85 above and restates and incorporates them herein by reference.

87. Defendants each intentionally defrauded Kula.

88. Kula relied upon Defendants' acts, practices, and courses of business that operated as a fraud upon him and would not have expended his time and money on the International business venture but for those acts, practices, and course of conduct.

89. Kula was defrauded thereby and Plaintiff suffered damages.

## COUNT VI

## Fraudulent Misrepresentation

90. Plaintiff reasserts Paragraphs 1 through 89 above and restates and incorporates them herein by reference.

91. Defendants made intentional misrepresentations to Kula and intentionally omitted material information under circumstances where Defendants had a duty to speak.

92. Kula relied upon Defendants' misrepresentations and omissions and would not have contributed his time, money, products, and services to International but for those misrepresentations and omissions.

93. Plaintiff suffered damages because of Defendants' misrepresentations and omissions.

## COUNT VII

### Negligent Misrepresentation

94. Plaintiff reasserts Paragraphs 1 through 93 above and restates and incorporates them herein by reference.

95. Defendants made negligent misrepresentations to Kula and negligently omitted information necessary to make their representations not misleading, intending that he would rely upon them.

96. Kula relied upon Defendants' misrepresentations and omissions to his detriment.

97. As a result of these misrepresentations and omissions Plaintiff suffered damages.

## COUNT VIII

### Unjust Enrichment

98. Plaintiff reasserts Paragraphs 1 through 97 above and restates and incorporates them herein by reference.

99. Plaintiff conferred a benefit upon the Defendants.

100.    Defendants accepted the benefit.

101.    Defendants accepted the benefit under such circumstances that it would be inequitable for Defendants to retain the benefit without paying the value thereof.

## COUNT IX

### Civil Conspiracy

102.    Plaintiff reasserts Paragraphs 1 through 101 above and restates and incorporates them herein by reference.

103.    Defendants conspired to illegally convert the business known as International and the income therewith for their own use and gain to the exclusion of Plaintiff.

104.    This conspiracy was a combination of two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose.

105.    As a result of this conspiracy, Plaintiff was damaged.

### COUNT X

### Civil Damages under § 9-1-2 based on violations of §§11-18-1, 11-18-6, 11-18-7, 11-18-8, 11-41-1, 11-41-3, 11-41-4, and/or 11-42-2

106.    Plaintiff repeats and realleges paragraphs 1 through 105, except that for purposes of this Count, all references to "knew or should have known" are deleted and the word "knew" substituted therefor.

107.    Defendants each committed violations of R.I. Gen. Laws §§11-18-1, 11-18-6, 11-18-7, 11-18-8, 11-41-1, 11-41-3, 11-41-4, and/or 11-42-2. Such violations included:

a)    violation of R.I. Gen. Laws § 11-18-1 by, knowingly giving a document to an agent, employee, or servant of Plaintiff in respect of which Plaintiff was interested, which contained a statement that was false or erroneous or defective in any important particular and which was knowingly intended to mislead Plaintiff;

b)    violation of R.I. Gen. Laws § 11-18-6 by, knowingly making or causing to be made either directly or indirectly, or through any agency whatsoever, a false statement in writing, with intent that it shall be relied upon, respecting the financial condition, of International, for the purpose of procuring in any form whatsoever the payment of cash or the making of a loan or credit, for the benefit of themselves;

c)  violation of R.I. Gen. Laws § 11-18-7 by, knowing that a false statement in writing had been made respecting the financial condition of  International, procuring, upon the faith of the statement, for their benefit, either or any of the things of benefit as provided in R.I. Gen. Laws § 11-18-6;

d)  violation of R.I. Gen. Laws § 11-18-8 by , knowing that a statement in writing had been made respecting the financial condition of International., representing on a later day, either orally or in writing, that the statement previously made, if then again made on that day, would be then true, when, in fact, that statement if then made would be false, and procure upon the faith of it, for their own benefit, either or any of the things of benefit as provided in R.I. Gen. Laws § 11-18-6;

e)  violation of R.I. Gen. Laws § 11-41-4, by obtaining from another designedly, by any false pretense(s), any money or other property, with the intent to cheat or defraud;

f)  violation of R.I. Gen. Laws § 11-41-1, by stealing money, goods, and/or chattels from the Plaintiff;

g)  violation of R.I. Gen. Laws § 11-41-3, by embezzling and/or fraudulently converting to their own use, money that came under their direct care or charge by virtue of their employment or their acting as operators or managers for International;

h)  violation of R.I. Gen. Laws § 11-42-2, Extortion and blackmail, by verbally and in writing, maliciously threatened to accuse Kula of a crime or offense and by a verbally and in writing maliciously threatened injury to Kula's reputation, property, and/or financial condition with the intent to extort Kula's successful business and/or with the intent to compel Kula to act against his will to sign his business over to Defendants.

108.    To the extent they did not directly violate said statutes, Defendants aided and abetted
        violation of said statutes by the other Defendant(s) and one another, and, therefore, are
        liable as principals pursuant to R.I. Gen. Laws §11-1-3.

109.    Defendants combined and conspired to violate said statutes, and, therefore, are liable as
        principals pursuant to R.I. Gen. Laws §11-1-6.

110.    Said Defendants' violations of R.I. Gen. Laws §11-18-1, 11-18-6, 11-18-7, 11-18-8, 11-
        41-1, 11-41-3, 11-41-4, and/or 11-42-2 constituted commissions of crimes or offenses
        causing injuries for which Defendants have civil liability under R.I. Gen. Laws §9-1-2.

111.    Plaintiff has been damaged as a result.

## COUNT XI

## R.I. Gen. Laws §7-15-1 *et seq*

112.    Plaintiff repeats and realleges paragraphs 1 through 111, as if set forth fully herein.

103.    Defendants knowingly received income derived from racketeering activity and used that
        income to acquire an interest in Kula's business assets.

114.    "Racketeering activity" under R.I. Gen. Laws § 7-15-1 includes any act involving larceny
        and/or extortion.

115.    Defendants' conduct obtaining property and/or money and/or aiding and abetting in
        obtaining property and/or money from Plaintiff  under false pretenses constitutes
        racketeering activity under R.I. Gen. Laws § 7-15-2(a).

116.    Defendants knowingly received income from a racketeering activity and directly or
        indirectly used or invested part of that income or the proceeds of that income in the
        operation of an enterprise, i.e. International. and EWM-LED in violation of R.I. Gen.

Laws § 7-15-2(a).

117.  Defendants conspired to commit acts of larceny and extortion to divest Plaintiff of their business assets.

**118.** Plaintiff was injured in business, income, and assets by reason of said Defendants' violations of R.I. Gen. Laws § 7-15-2(a).


## COUNT XVI

### 18  SC § 1961 (RICO) damages under 18 USC § 1964(c)

119. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 118 above as if fully stated herein.

120. Defendants voluntarily and intentionally, with the intent to defraud, devised and/or participated in a scheme to defraud Plaintiff by means of false pretenses.

121.Defendants used interstate wire communications in furtherance of their scheme to defraud Plaintiff.

122.Plaintiff was defrauded as a result of Defendants' conduct and thereby suffered damages.

123.Defendants criminal acts as documented above suffice as predicate acts under 18 USC §1961.


## COUNT XVII

### Negligent Misrepresentation

124.Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 123 above as if fully stated herein.

125.The allegations above caused damage to Plaintiff and constitute a cause of action for Negligent Misrepresentation.

## COUNT XVIII

### Intentional Misrepresentation

126. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 125 above as if fully stated herein.

127. The allegations above caused damage to plaintiff and constitute a cause of action for Intentional Misrepresentation.

## COUNT XIX

### Slander *per se*

128. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 127 above as if fully stated herein.

129. The allegations above constitute a cause of action for slander per se.

**130.** Upon information and belief, that at all times hereinafter mentioned, Defendant maliciously injured Plaintiff's good name, reputation and business when engaging in slander per se.

131. Upon information and belief, that at all times hereinafter mentioned, Defendants made false statements in full knowledge that they were untrue or in reckless disregard of its truth or falsity, and for the purpose of injuring Plaintiff's good name, reputation and business.

## COUNT XX

### Defamation of Character

132. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 131 above as if fully stated herein.

133. The allegations above constitute a cause of action for defamation of character.

134. Upon information and belief, that at all times hereinafter mentioned, Defendants proactively and repeatedly committed acts of defamation of character against Plaintiff.

135. The defamation of character committed by Defendants has caused irreparable financial damage and economic loss to Plaintiff and continues to do so to date.

**136.** Consequently, Plaintiff has been damaged and hereby demands damages in an amount to be proven at trial against each of the defendants, individually and severally.

## COUNT XXI

### Trade Libel

137. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 136 above as if fully stated herein.

138. The allegations above constitute a cause of action for trade libel.

139. Upon information and belief, that at all times hereinafter mentioned, Defendants maliciously injured Plaintiff's good name, reputation and business when engaging in trade libel.

140. Consequently, Plaintiff has been damaged and hereby demands damages in an amount to be proven at trial against each of the defendants, individually and severally.


WHEREFORE, Plaintiffs demand judgment against all Defendants in the amount of Fifteen Million Dollars ($15,000,000), together with interest, costs of suit, attorney's fees, and punitive damages.


Dated:  June 18, 2017

Plaintiffs, Individually and Derivatively, Dwayne
Kula; Everlite 99, LLC; DRK Enterprises; LLC, by
their Attorneys,

*/s/* Jeanne M. Scott, Esq.

Jeanne M. Scott, Esq., R.I. Bar #6178
2 Broadway
Newport, RI 02840
401-374-3141
jms@jeannescottlaw.com

ALMAGNO LAW

/s/ Lawrence P. Almagno Jr.

Lawrence P. Almagno Jr., R.I. Bar #9185

973 Reservoir Avenue

Cranston, RI 09210

T | 401-946-4529

F | 401-464-4529